COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
DIVISION ___
CIVIL ACTION NO. _____

MGG INVESTMENT GROUP LP                                          PLAINTIFFS

v.                               **COMPLAINT**

ZAYAT STABLES, LLC,                                              DEFENDANTS
Serve:    Ahmed Zayat, Registered Agent
          401 Hackensack Ave., 7th Floor
          Hackensack, NJ 07601
and

AHMED ZAYAT
          401 Hackensack Ave., 7th Floor
          Hackensack, NJ 07601

For its Complaint against Defendants, Zayat Stables, LLC ("Zayat Stables") and Ahmed Zayat ("Mr. Zayat") (Zayat Stables and Ahmed Zayat are sometimes collectively referred to as "Defendants"), Plaintiff MGG Investment Group LP ("MGG Investment Group," the "Agent," or "Plaintiff") states as follows:

## NATURE OF THE ACTION

1.    In 2016 certain affiliates and related funds of MGG Investment Group (collectively, "MGG") made a series of loans to the thoroughbred horse racing company Zayat Stables secured by all the company's assets (including all its horses and breeding rights). As additional collateral, Ahmed Zayat, the sole owner of Zayat Stables, pledged the stock of Zayat Stables to further secure the loans.

2.    In order to induce MGG to make the loans, Zayat Stables and Mr. Zayat made several fraudulent misrepresentations concerning Zayat Stables' assets, as well as their intent to abide by the negotiated terms of the agreements.

3.    Since September 30, 2019, Zayat Stables has been in payment default under

1

the loan agreement, with currently over $23 million in the principal of the loans outstanding, plus accrued interest.  In the event of such a default, Zayat Stables has unconditionally consented to the appointment of a receiver to conserve its assets.

4.      MGG brings this action seeking fraud and contract damages as well as for the appointment of a receiver shortly after Mr. Zayat admitted to MGG that Zayat Stables and he had purported to sell several millions of dollars of the collateral on the loans out from under MGG, including but not limited to the breeding rights to the 2015 Triple Crown winner, AMERICAN PHAROAH.

### THE PARTIES

5.      Plaintiff MGG Investment Group is a Delaware limited partnership and is located at 888 Seventh Avenue, New York, New York 10106.  Pursuant to the Financing Agreement, described below, MGG Investment Group is the Administrative Agent and Collateral Agent (the "Agent") and was appointed and authorized by the lenders to enforce the rights and remedies of the lenders with respect to the parties to the loans.  (Financing Agreement § 10.01.)

6.      Upon information and belief, Defendant Zayat Stables is a Delaware limited liability company, with its principal place of business located at 401 Hackensack Avenue, 7th Floor, Hackensack, New Jersey 07601.  Zayat Stables is the borrower under the governing loan documents at issue in this action.

7.      Upon information and belief, Defendant Ahmed Zayat is an individual with an address of 401 Hackensack Avenue, Hackensack, New Jersey 07601.  Ahmed Zayat is the owner and sole member of Zayat Stables.

2

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000002 of 000030

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under KRS Chapter 23A as the amount in controversy exceeds the jurisdictional minimum on the Court.

9.      This Court has personal jurisdiction over the Defendants because, among other things, each Defendant has (a) purposefully committed, within the Commonwealth of Kentucky, the acts from which these claims arise and/or has committed unlawful acts outside the Commonwealth of Kentucky, knowing that such acts would cause injury in the Commonwealth; (b) transacted business in the Commonwealth of Kentucky; and/or (c) contracted for goods and/or services in the Commonwealth of Kentucky.

10.     Venue is proper in this judicial circuit under KRS 452.480 because a substantial part of the events and omissions giving rise to MGG's claims occurred in this judicial circuit and because Defendants have transacted business in this judicial circuit and may be properly joined in this Court.

## FACTS

### Background

11.     MGG is in the business of providing financing solutions to mid-size and growing companies.

12.     Zayat Stables is a thoroughbred horseracing organization.  In 2015, Zayat Stables' homebred horse, AMERICAN PHAROAH, became horseracing's 12th Triple Crown winner as well as the Breeders' Cup Classic champion.

13.     Upon information and belief, Ahmed Zayat is the owner and sole member of Zayat Stables.

3

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000003 of 000030

**Zayat Stables Provides MGG with Confirmation That Its Assets**
**Included Certain Breeding Rights to American Pharoah**

14.    On or about January 16, 2015, Zayat Stables sold 100% of the stallion shares of AMERICAN PHAROAH pursuant to a purchase agreement (the "AMERICAN PHAROAH Purchase Agreement") to Orpendale, a thoroughbred horseracing organization affiliated with the thoroughbred horseracing organizations Coolmore and Ashford Stud.  Zayat Stables received over $23 million in proceeds from Orpendale in connection with the AMERICAN PHAROAH Purchase Agreement.

15.    Pursuant to the AMERICAN PHAROAH Purchase Agreement, Zayat Stables retained the racing rights to AMERICAN PHAROAH.  Additionally, upon AMERICAN PHAROAH's transition to his breeding career after retiring from his racing career in 2015, Mr. Zayat's wife and children were assigned between them nine of the horse's lifetime breeding rights (the "Zayat AP Breeding Rights").  Each of the nine Zayat AP Breeding Rights entitle its holder to breed one thoroughbred mare with AMERICAN PHAROAH in each breeding season over the course of the horse's life.  (AMERICAN PHAROAH Purchase Agreement § 4(b).)

16.    In the Spring of 2016, Zayat Stables expressed interest in refinancing its existing debt while obtaining additional cash for equine acquisitions.

17.    MGG first met with Zayat Stables and Mr. Zayat on or about May 16, 2016, to discuss the potential for MGG to provide financing to Zayat Stables.

18.    Between that initial meeting and July 26, 2016, when the deal closed, Zayat Stables and MGG negotiated the terms of the loans at issue in this action, which were to be secured, among others, by all of Zayat Stables' assets.

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000004 of 000030

4

19. During this period, MGG learned that pursuant to the AMERICAN PHAROAH Purchase Agreement, the Zayat AP Breeding Rights were in the hands of Mr. Zayat's wife and children.

20. MGG informed Mr. Zayat that any loan from MGG to Zayat Stables would be contingent upon the Zayat AP Breeding Rights being among Zayat Stables' assets.

21. On July 6, 2016, Zayat Stables' counsel represented in an email to MGG's counsel that Mr. Zayat's wife and children would transfer their interests in the Zayat AP Breeding Rights to Zayat Stables and that Mr. Zayat would be willing to indemnify MGG for any losses, liabilities, costs and expenses, direct or indirect, in connection with those transfers. Mr. Zayat ultimately provided such an indemnity in a member pledge agreement, date July 26, 2016 (the "Member Pledge Agreement").

22. On July 8, 2016, Zayat Stables provided MGG with documentation confirming that Mr. Zayat's wife and children had transferred the Zayat AP Breeding Rights to Zayat Stables (the "Zayat AP Breeding Rights Transfer Document"). Mr. Zayat signed the Zayat AP Breeding Rights Transfer Document in his personal capacity and in his capacity as the CEO of Zayat Stables. Mr. Zayat's wife, Joanne Zayat, and his children, Justin Zayat, Ashley Zayat, Benjamin Zayat, and Emma Zayat, also signed the Zayat AP Breeding Rights Transfer Document. A true and accurate copy of the Zayat AP Breeding Rights Transfer Document is attached hereto as **Exhibit A**.

23. That same day, on July 8, 2016, Ashford Stud, which was the thoroughbred breeding organization housing AMERICNA PHAROAH along with its affiliates Coolmore and Orpendale, and that, upon information and belief, along with those affiliates, held 100% of the stallion shares of American Pharoah, provided further confirmation of the transfer of the Zayat AP

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000005 of 000030

5

Breeding Rights from Mr. Zayat's wife and children to Zayat Stables (the "Zayat AP Breeding Rights Transfer Confirmation"). The Zayat AP Breeding Rights Transfer Confirmation was also sent to MGG. A true and accurate copy of the Zayat AP Breeding Rights Transfer Confirmation is attached hereto as **Exhibit B**.

**The Financing Agreement**

24.    Thereafter, on or about July 26, 2016, Zayat Stables as the Borrower entered into a financing agreement with certain affiliates of MGG Investment Group as Lenders, and MGG Investment Group as Administrative Agent and Collateral Agent (the "Financing Agreement"). A true and accurate copy of the Financing Agreement is attached hereto as **Exhibit C**.

25.    Pursuant to the Financing Agreement,

> Borrower has requested the Lenders to extend credit to the Borrower consisting of (a) a term loan in the aggregate principal amount of $25,000,000 and (b) a delayed draw term loan in the aggregate principal amount of $10,000,000. The proceeds of the term loans made available on the Effective Date shall be used to (i) refinance existing indebtedness of the Borrower in an amount not to exceed $10,860,000, (ii) to pay down accounts payable in an amount not to exceed $4,500,000, (iii) to fund the acquisition of additional equine assets in an aggregate amount of at least $7,000,000, and (iv) to pay fees and expenses related to this Agreement and for general working capital purposes of the Borrower. The availability of any Delayed Draw Term Loan by any Lender shall be at the sole and absolute discretion of the Agents, it being expressly understood and agreed that no Lender has any obligation whatsoever to make any Delayed Draw Term Loan.

(Financing Agreement at 1, Recitals.)

26.    The Financing Agreement further provides for a schedule of repayment of the term loan as follows:

> The outstanding principal of the Term Loans shall be repayable on the following dates and in the following amounts set forth opposite such dates [. . .] :

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000006 of 000030

6

| Payment Date | Principal Amortization Amount (% of Loans Advanced) |
|---|---|
| September 30, 2017 | 3% |
| December 31, 2017 | 5% |
| March 30, 2018 | 1% |
| June 30, 2018 | 1% |
| September 30, 2018 | 3% |
| December 31, 2018 | 5% |
| March 30, 2019 | 1% |
| June 30, 2019 | 1% |
| September 30, 2019 | 3% |

| Payment Date | Principal Amortization Amount (% of Loans Advanced) |
|---|---|
| December 31, 2019 | 5% |
| March 30, 2020 | 1% |
| June 30, 2020 | 1% |
| Final Maturity Date | Aggregate principal amount of outstanding Loans |

(Financing Agreement § 2.03(a).)

27.    As a condition precedent to the Financing Agreement going into effect, the Financing Agreement provided that MGG must have first received a duly executed Pledge and Security Agreement, detailed below, whereby Zayat Stables pledged all of its assets as Collateral for the loans.  (Financing Agreement § 5.01(d)(i).)

28.    Under the Financing Agreement, "Collateral" is defined as:

All of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations, including, without limitation, all Equine Collateral.

(Financing Agreement § 1.01.)

29.    "Equine Collateral" is defined under to the Financing Agreement as:

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000007 of 000030

Filed    20-CI-00248 01/21/2020    Vincent Riggs, Fayette Circuit Clerk

Filed                    20-CI-00248 01/21/2020                    Vincent Riggs, Fayette Circuit Clerk

All horses, stallions, mares, weanlings, foals, thoroughbred bloodstock and/or stallion shares, **breeding rights**, lifetime **breeding rights** and/or fractional interests therein, their offspring and young, both born and unborn, and/or fractional interests therein, stallion seasons and shares, and any other interests in any of the foregoing, owned by the Borrower or any of its Subsidiaries, howsoever classified, whether now owned or hereafter acquired, and including all substitutions and replacements thereof.

(Financing Agreement § 1.01) (emphasis supplied).

30.     The Financing Agreement provides that:

Upon the occurrence and during the continuance of an Event of Default, (i) the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(Financing Agreement § 2.04(b).)

31.     Additionally, pursuant to the Financing Agreement § 2.05(c)(ii), in the event of a disposition (other than the involuntary loss, damage or destruction of property or any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property), including the disposition of Equine Collateral, whether such disposition was a Permitted Disposition or not, among other things, Zayat Stables is obligated to use a certain percentage of the proceeds of the disposition (not less than 50% and in some cases up to 100%, depending on the disposition at issue) to partially pre-pay the outstanding principal of the loans.

32.     Further, pursuant to the Financing Agreement, Zayat Stables made several covenants.  For instance, Zayat Stables covenanted that it would, while any Loans remained outstanding, deliver to MGG a compliance certificate along with monthly, quarterly, and annual financial statements in which Zayat Stables was required to state whether any Events of Default

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000008 of 000030

Filed                    20-CI-00248 01/21/2020                    Vincent Riggs, Fayette Circuit Clerk

had occurred during the applicable period and to describe any dispositions of Equine Collateral made during the applicable period. (Financing Agreement § 7.01(a)(i)-(iv).)

33. Additionally, Zayat Stables covenanted that it would not, while any Loans remained outstanding,

> Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(Financing Agreement § 7.02(c)(ii).)

34. The Financing Agreement allows for certain Permitted Dispositions, including of Equine Collateral, but only under certain conditions, including that the sale be in the ordinary course of business and for fair market value. As such, none of the dispositions of Equine Collateral at issue in this action, described below, were Permitted Dispositions. However, even if they were, pursuant to the Financing Agreement § 2.05(c)(ii) and as stated above, Zayat Stables was obligated to use a certain percentage of the proceeds of the disposition (not less than 50% and in some cases up to 100%, depending on the disposition at issue) to partially pre-pay the outstanding principal of the loans. And Zayat Stables did not make any principal payments as the result of any of the dispositions at issue in this action.

35. Additionally, as a condition precedent to all loans made pursuant to the Financing Agreement:

> The following statements shall be true and correct, and the submission by the Borrower to the Administrative Agent of a Notice of Borrowing with respect to each such Loan, and the Borrowers' acceptance of the proceeds of such Loan, shall each be deemed to be a representation and warranty by each Loan Party on the date of such Loan that:

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000009 of 000030

9

Filed                    20-CI-00248 01/21/2020              Vincent Riggs, Fayette Circuit Clerk

(i) the representations and warranties contained in Article VI [. . .] on or prior to the date of such Loan are true and correct in all material respects [. . .] on and as of such date as though made on and as of such date [. . .],

(ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made, on such date and

(iii) the conditions set forth in this Section 5.02 have been satisfied as of the date of such request.

(Financing Agreement § 5.02(c).)

36.     Pursuant to Section 6.01 of the Financing Agreement, Zayat Stables "represents and warrants to the Secured Parties" that it "has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business (including the Equine Collateral), free and clear of all Liens, except Permitted Liens."  (Financing Agreement § 6.01(o).)

37.     Under the Financing Agreement, certain events constitute an Event of Default, including the following:

(a) The Borrower shall fail to pay, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (i) any interest on any Loan, any Collateral Agent Advance, or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Loans) or any other Loan Document, and such failure continues for a period of two (2) Business Days or (ii) all or any portion of the principal of the Loans;

(b) Any representation or warranty made or deemed made by or on behalf of any Credit Party [i.e. Zayat Stable or Mr. Zayat] or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall prove to have been incorrect in any material respect [. . .] when made or deemed made;

(c) The Borrower or any of its Subsidiaries shall fail to perform or comply with any covenant or agreement contained in:

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000010 of 000030

10

(i) [. . .] Section 7.02 [. . .], or the Borrower or any of its Subsidiaries shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party or any Mortgage to which it is a party, [. . .]

(d) Any Credit Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by such Person and [. . .] such failure, if capable of being remedied, shall remain unremedied for 15 days after [. . .] any Loan Party or the Permitted Holder has knowledge of such failure and the date written notice of such default shall have been given by any Agent to such Credit Party; or

(s) An event or development occurs that could reasonably be expected to have a Material Adverse Effect.

(Financing Agreement § 9.01 (a)-(d), (s).)

38.     Pursuant to the Financing Agreement, if an Event of Default occurs:

The Collateral Agent may [. . .] by notice to the Borrower,

(i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced,

(ii) declare all or any portion of the Loans then outstanding to be accelerated and due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, together with the payment of the Applicable Premium with respect to the Commitments so terminated and the Loans so repaid, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and

(iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents [. . . .]

(Financing Agreement § 9.01.)

39.     In late September 2016, in connection with the Financing Agreement, the Agent filed UCC-1 financing statements in Kentucky, Delaware, New York, Florida, and California, each documenting the Agent's security interests in Zayat Stables' assets.  True and accurate copies of the UCC-1 financing statements are compiled and attached hereto as **Exhibit D**.

11

40.    By filing the UCC-1 statements, the Agent perfected its lien on all of Zayat Stables' assets, including its horses and breeding rights.

41.    On September 30, 2016, Zayat Stables and MGG executed the first amendment to the Financing Agreement (the "First Amendment to Financing Agreement") whereby MGG provided Zayat Stables with $5 million of the delayed draw term loan. A true and accurate copy of the First Amendment to Financing Agreement is attached hereto as **Exhibit E**.

## The Pledge and Security Agreement

42.    On or about July 26, 2016, Zayat Stables as Grantor entered into a pledge and security agreement (the "Pledge and Security Agreement") in favor of the Agent, a true and accurate copy of which is attached hereto as **Exhibit F**. (The Pledge and Security Agreement and the Financing Agreement are sometimes collectively referred to herein as the "Loan Agreements".)

43.    Pursuant to the Pledge and Security Agreement,

As collateral security for the payment, performance and observance of all of the Secured Obligations, each Grantor hereby pledges and assigns to the Collateral Agent [. . .], and grants to the Collateral Agent [. . .], for the benefit of the Secured Parties, a continuing security interest in, all personal property and Fixtures, if any, of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as the "Collateral"):

(a) all Equine Collateral, including, without limitation, (i) all racing income, breeders' awards, Accounts and General Intangibles arising from any stallion syndication agreement, any sale or other Disposition of any stallion seasons or shares or otherwise derived from or in any way related to any Equine Collateral, (ii) all certificates of title, certificates of registration and other evidences of ownership in any way relating to, or connected with, any Equine Collateral, including, without limitation, all Jockey Club Certificates of Registration and all stallion share certificates, and (iii) all policies of insurance on any of the Equine Collateral and all rights to proceeds thereof and refunds thereunder;

(b) all Accounts (including without limitation, Accounts relating to any of the Equine Collateral); and

12

(o) all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral.

(Pledge and Security Agreement § 2.)

44.    Pursuant to the Pledge and Security Agreement, Zayat Stables irrevocably and unconditionally:

(i)    Consents to the appointment (after the occurrence and during the continuance of an Event of Default) of pre-judgment and/or post-judgment receiver with all of the same powers that would otherwise be available to the Grantors, including, without limitation, the power to (A) hold, manage, control or dispose of the Collateral wherever located, (B) take any action with respect to the Collateral to the maximum extent permitted by law and (C) conduct a public or private sale of any or all of the Grantors' right, title and interest in and to such Collateral, including any disposition of the Collateral to the Collateral Agent or the Lenders in exchange for cancellation of all or a portion of the Obligations;

(ii)    Consents that any such receiver can be appointed **without a hearing or prior notice to the Grantors**;

(iii)    Agrees not to oppose or otherwise interfere (directly or indirectly) with any effort by Collateral Agent to seek the appointment of a receiver;

(iv)    Waives any right to demand that a bond be posted in connection with the appointment of any such receiver; and

(v)    Waives any right to appeal the entry of an order authorizing the appointment of a receiver.

(Pledge and Security Agreement § 9(h)) (emphasis supplied).

**<u>Defendants Begin to Purport to Sell Off Assets in Violation of the Loan Agreements</u>**

45.    Based on documents and information only recently provided to MGG, and upon information and belief, beginning in December 2018 and potentially earlier, Zayat Stables and Mr. Zayat engaged in a fraudulent scheme in violation of the Loan Agreements whereby they purported to sell off millions of dollars of the collateral that secured the loans from MGG without obtaining MGG's consent, and while concealing the purported sales from MGG.

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000013 of 000030

13

46. Based on documents and information only recently provided to MGG, and upon information and belief, Zayat Stables and Mr. Zayat made these purported sales because of severe financial troubles at Zayat Stables.

47. The improper purported sales included some of Zayat Stables' most valuable assets, most notably the nine breeding rights to AMERICAN PHAROAH that were explicitly contemplated throughout the loan negotiations as being among Zayat Stables' assets, all of which were pledged to secure the loans.

48. Mr. Zayat directly enlisted his wife and children into his improper scheme, as each member of Mr. Zayat's family purported to sell rights that had already been transferred to Zayat Stables in advance of the loan in July 2016.

49. Upon information and belief, Mr. Zayat was fully aware that MGG's loans to Zayat Stables were contingent upon the AMERICAN PHAROAH breeding rights being among its assets, all of which were pledged to secure the loans, as evidenced by the Zayat AP Breeding Rights Transfer Document, which he signed along with his wife and children.

50. Nevertheless, as detailed below, upon information and belief, between December 2018 and June 2019 Mr. Zayat and his family purported to sell all nine of the Zayat AP Breeding Rights, with proceeds of the purported sales totaling $3.3 million.

51. On or about December 21, 2018, upon information and belief, Justin Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 1 of AMERICAN PHAROAH to LNJ Foxwoods in exchange for $375,000. A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit G**.

52. On or about December 21, 2018, upon information and belief, Justin Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 2 of

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000014 of 000030

14

AMERICAN PHAROAH to LNJ Foxwoods in exchange for $375,000. A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit H**.

53. On or about March 26, 2019, upon information and belief, Justin Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 3 of AMERICAN PHAROAH to Orpendale in exchange for $400,000. A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit I**.

54. On or about March 29, 2019, upon information and belief, Justin Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 4 of AMERICAN PHAROAH to Orpendale in exchange for $400,000. A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit J**.

55. On or about April 14, 2019, upon information and belief, Benjamin Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 5 of AMEICAN PHAROAH to Orpendale in exchange for $350,000.

56. On or about April 14, 2019, upon information and belief, Ashley Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 6 of AMERICAN PHAROAH to Orpendale in exchange for $350,000. A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit K**.

57. On or about May 1, 2019, upon information and belief, Emma Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 7 of AMERICAN PHAROAH to Orpendale in exchange for $350,000. A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit L**.

58. On or about June 5, 2019, upon information and belief, Joanne Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 8 of

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000015 of 000030

15

AMERICAN PHAROAH to Orpendale in exchange for $350,000.  A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit M**.

59.    On or about June 5, 2019, upon information and belief, Joanne Zayat purported to execute a bill of sale and assignment of Lifetime Breeding Right No. 9 of AMERICAN PHAROAH to Orpendale in exchange for $350,000.  A true and accurate copy of the purported bill of sale and assignment is attached hereto as **Exhibit N**.

60.    Zayat Stables did not make any principal payments as the result of any of the purported sales of the Zayat AP Breeding Rights, as was required pursuant to the Financing Agreement § 2.05(c)(ii).

61.    Upon information and belief, Zayat Stables' and Mr. Zayat's pattern and practice of purporting to sell Zayat Stables' pledged equine collateral out from under the Agent's security interests was not limited to the breeding rights in AMERICAN PHAROAH.

62.    Even though MGG is not aware of all of the deceptive actions of Zayat Stables and Mr. Zayat, it has already uncovered several million dollars of equine collateral in addition to the interests in AMERICAN PHAROAH that Zayat Stables and Mr. Zayat have purported to sell out from under the Agent's security interests in violation of the Loan Agreements.

63.    Indeed, upon information and belief, beginning in December 2018 and potentially earlier, and possibly continuing to this day, Defendants have purported to sell interests and/or rights in at least 15 other valuable racing thoroughbreds, including but not limited to: AMERICAN CLEOPATRA (reportedly sold for over $1.3 million), BODEMIESTER, ESKENDEREYA, ZENSATIONAL, JUSTIN PHILLIP, GRAMMAJO, DANYELLI, LEZENDARY, OLD GLORY, LEMOONA, AAMANDREA, ASH N' EM, MAJID, EL KABEIR, and PRAYER FOR RELIEF.

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000016 of 000030

64.     As they did with the purported sales of the Zayat AP Breeding Rights, Zayat Stables and Mr. Zayat concealed these transactions from MGG and others so as to allow the fraudulent scheme to continue undetected.

65.     Additionally, as they did with the purported sales of the Zayat AP Breeding Rights, Zayat Stables did not make any principal payments as the result of any of these purported sales of Equine Collateral, as was required pursuant to the Financing Agreement § 2.05(c)(ii).

**Zayat Stables Defaults on Its Loan Payments**

66.     Zayat Stables failed to pay the principal installment of the term loan on September 30, 2019, as was required pursuant to Section 2.03(a) of the Financing Agreement, giving rise to an Event of Default under Section 9.01(a) of the Financing Agreement.

67.     A few days before the September 30, 2019 payment was due, Mr. Zayat informed MGG that Zayat Stables would not be able to make the required loan payments.

68.     On or about October 24, 2019, Mr. Zayat visited MGG's offices in New York.  After that meeting, Mr. Zayat informed MGG that several hundreds of thousands of dollars in proceeds of a recent sale of his family's personal assets were used to pay other debts of Zayat Stables and were not used to pay MGG as required by the Loan Agreements.

69.     On or about December 4, 2019, MGG sent Zayat Stables a notice of default and reservation of rights (the "Notice of Default"), a true and accurate copy of which is attached hereto as **Exhibit O**.

70.     In addition to the Event of Default related to Zayat Stables' failure to make the payment due on September 30, 2019, the Notice of Default lists two additional Events of Default.

71.     First, the Notice of Default lists an Event of Default that arose under Section 9.0l(a) of the Financing Agreement as a result of Zayat Stables' failure to pay interest on the Loan

17

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000017 of 000030

pursuant to Section 2.04(c) of the Financing Agreement due on October 1, 2019, November 1, 2019, and December 1, 2019.

72.     Second, the Notice of Default lists an Event of Default that arose under Section 9.0l(a) of the Financing Agreement as a result of the Loan Parties' failure to pay the Loan Servicing Fee pursuant to Section 2.06(c) of the Financing Agreement due on October 31, 2019.

73.     In addition to the Events of Default listed in the Notice of Default, there is evidence of several other Events of Default, including but not limited to Events of Default resulting from Zayat Stables' purported sales of Equine Collateral that were not reported to or permitted by MGG, as described herein, as well as additional payment defaults.

74.     These Events of Default are continuing under the Loan Agreements and as a result MGG is currently owed over $23 million in the principal of the loan plus accrued interest.

**Zayat Stables and MMG Discuss Potential Liquidation Plan**

75.     In response to the Notice of Default, on or about December 12, 2019, Mr. Zayat sent MGG a liquidation plan (the "Liquidation Plan") on behalf of Zayat Stables, a true and accurate copy of which is attached hereto as **Exhibit P**.

76.     Upon information and belief, the Liquidation Plan lists as assets of Zayat Stables numerous equine assets (including, without limitation, the Zayat AP Breeding Rights) that, as MGG subsequently discovered, Zayat Stables has in fact purported to have already sold.

77.     On or about December 16, 2019, Dane Joella, a Director at MGG, met with Mr. Zayat and his son Justin Zayat in MGG's offices in New York to discuss the Liquidation Plan. At this meeting, Mr. Zayat and MGG agreed to meet again in mid-January 2020 upon completion of Mr. Zayat's capital raising roadshow in Asia.

78.     On or about December 18, 2019, MGG asked Zayat Stables to sell certain assets listed in the Liquidation Plan in order to generate proceeds with which to pay MGG as soon

18

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000018 of 000030

as possible.  As MGG would soon come to discover, several of the assets it requested to be sold had already been purportedly sold by Zayat Stables in breach of the Loan Agreements.

**MGG Uncovers Zayat's Scheme**

79.     On or about January 2, 2020, the asset appraiser appointed pursuant to the Loan Agreements called Dane Joella or MGG and informed Joella of his belief that Zayat Stables no longer owned any breeding rights to AMERICAN PHAROAH.  After the call, pursuant to the Financing Agreement's periodic appraisal requirement, the appraiser provided MGG with his most recent appraisal, indicating his suspicion of Zayat Stables' ownership in the Zayat AP Breeding Rights.

80.     On that same day, on or about January 2, 2020, Dane Joella of MGG called Frank Phelan, the CFO of Ashford Stud, who said that he would not discuss AMERICAN PHAROAH's breeding rights without permission from Mr. Zayat.

81.     On or about January 7, 2020, Kevin Griffin of MGG called Mr. Zayat to confront him regarding the breeding rights to AMERICAN PHAROAH.  On that call, Mr. Zayat denied that any of the breeding rights had been sold.

82.     On or about January 8, 2020, Mr. Zayat gave Aisling Duignan at Coolmore permission to speak with MGG.

83.     On or about January 9, 2020, Dane Joella of MGG emailed Aisling Duignan to schedule a time to discuss Zayat Stables' breeding rights in AMERICNA PHAROAH.

84.     On or about January 10, 2020, Dane Joella of MGG called and emailed Frank Phelan, the CFO of Ashford Stud, to discuss Zayat Stables' breeding rights in AMEICAN PHAROAH.

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000019 of 000030

19

85.     On or about January 11, 2020, MGG's former counsel, Chapman Hopkins, spoke with Aisling Duignan at Coolmore, who refused to provide any information at that time, but noted that the matter had been elevated to her superior.

**Zayat Admits That He Purported To Sell Collateral in Violation of the Loan Agreements**

86.     On or about January 12, 2020, Mr. Zayat called Patrick Flynn of MGG and admitted that Defendants purported to have sold the Zayat AP Breeding Rights.

87.     On that same day, Mr. Zayat sent an email to MGG and admitted that Defendants purported to have sold the Zayat AP Breeding Rights over the course of seven months between December 2018 and June 2019 for a total of $3.3 million.  A true and accurate copy of Mr. Zayat's January 12, 2020 email is attached hereto as **Exhibit Q**.

88.     In that January 12, 2020 email, Mr. Zayat wrote the following: "I am ready if needed to walk away and give you the keys and full control if that is what you want."

89.     On or about January 13, 2020, Dane Joella of MGG spoke on the phone with Aisling Duignan at Coolmore who confirmed the purported sales of the breeding rights to AMERICNA PHAROAH.

90.     On or about January 15, 2020, Mr. Zayat sent an email to MGG in which he admitted to have purported to sell without permission, notice, or pay-down additional Equine Collateral, including assets related to AMERICNA CLEOPATRA, GRAMMAJO, DANYELLI, LEZENDARY, OLD GLORY, and LEMOONA.

91.     On or about January 16, 2020, MGG's preliminary investigation uncovered information to suggest that Zayat Stables had purported to sell without permission, notice, or pay-down additional Equine Collateral, including assets related to AMANDREA, ASH N' EM, MAJID, BODEMEISTER, ESKENDEREYA, EL KABEIR, ZENSATIONAL, JUSTIN PHILLIP, and PRAYER FOR RELIEF.

20

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000020 of 000030

## MGG's Collateral Is in Jeopardy Such That a Receiver Should Be Appointed

92.     As stated above, the Agent obtained security interests in all of Zayat Stables' assets, including all of its horses and breeding rights, as Collateral to secure a series of loans totaling $30 million.

93.     As demonstrated above, Zayat Stables and Mr. Zayat have shown through their actions that they are willing to purport to sell Zayat Stables' valuable assets out from under the Agent's security interest, and they will continue to do so unless a receiver is appointed.

94.     In addition, on the basis of Mr. Zayat's communications with MGG it is clear that Zayat Stables and Mr. Zayat no longer have the resources necessary to continue to pay for the upkeep of their valuable equine assets that are MGG's Collateral.  In fact, according to Mr. Zayat's January 12, 2019 email to MGG, in order to keep Zayat Stables in operation he has exhausted all of his savings and his business and personal bank accounts, and has resorted to seeking loans from friends, family, and even payday lenders.  (*See* Exhibit Q attached hereto.)

95.     Because Zayat Stables and Mr. Zayat lack the cash flow necessary to fund basic services, the Equine Collateral will at best diminish in value and at worst be permanently lost.

96.     If Zayat Stables or Mr. Zayat are unable to feed and care for the Equine Collateral, or make additional efforts to dispose of assets, the foreclosure process will simply take too long and the Equine Collateral will be lost.

97.     MGG is prepared to expend the necessary capital for a receiver to oversee the liquidation of the Collateral.[1]

---

[1] Attached hereto as **Exhibit R** is the Affidavit of Dane E. Joella of MGG Investment Group in support of the foregoing factual recitations.

21

## COUNT I: Breach of Contract
### (Against Zayat Stables)

98.     Plaintiff repeats the allegations contained in Paragraphs 1 through 97 as if fully set forth herein.

99.     The Loan Agreements are valid and enforceable contracts between MGG and Zayat Stables.

100.    MGG has performed its obligations under the Loan Agreements and has satisfied all conditions precedent to their enforcement.

101.    Zayat Stables has breached the terms of the Loan Agreements by, among other things:

i.    Failing to pay the principal installment of the Term Loan on September 30, 2019, as was required pursuant to Section 2.03(a) of the Financing Agreement, which constitutes an Event of Default under, *inter alia*, Sections 9.01(a) and 9.01(d) of the Financing Agreement;

ii.   Failing to pay interest on the Loan pursuant to Section 2.04(c) of the Financing Agreement due on October 1, 2019, November 1, 2019, and December 1, 2019, which constitute Events of Default under, *inter alia*, Sections 9.01(a) and 9.01(d) of the Financing Agreement;

iii.  Failing to pay the Loan Servicing Fee pursuant to Section 2.06(c) of the Financing Agreement due on October 31, 2019, which constitutes an Event of Default under, *inter alia*, Sections 9.01(a) and 9.01(d) of the Financing Agreement; and

iv.   Purporting to sell Equine Collateral, including but not limited to the breeding rights of AMERICAN PHAROAH, in violation of Section

22

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000022 of 000030

7.02(c)(ii) of the Financing Agreement which constitutes an Event of Default under, *inter alia*, Sections 9.01(c), 9.01(d) and 9.01(s) of the Financing Agreement;

v. Failing to pay amounts due to MGG as a result of Defendants' purported or actual disposition of Collateral, including Equine Collateral, in violation of Section 2.04(c)(ii) of the Financing Agreement, which constitute Events of Default under, *inter alia*, Sections 9.01(a), 9.01(d) and 9.01(s) of the Financing Agreement; and

vi. Failing to deliver to MGG accurate monthly, quarterly and/or annual financial statements and other reports for Zayat Stables disclosing the purported dispositions of Equine Collateral and resulting Events of Default, in violation of Sections 7.01(a)(i-v), 7.01(viii) and 7.01 (xiv), which constitute Events of Default under, *inter alia*, Sections 9.01(c), 9.01(d) and 9.01(s).

102.    Pursuant to the Loan Agreements, these breaches constitute Events of Default under the Financing Agreement and the Pledge and Security Agreement.

103.    Zayat Stables has failed to cure its numerous breaches of the Loan Agreements, despite written demand to do so, and the resulting Events of Default under those agreements are continuing.

104.    Under the Financing Agreement, upon an Event of Default, MGG is entitled to all remedies provided for in the Financing Agreement, including but not limited to, (i) terminating or reducing all commitments under the Loan Agreements, (ii) accelerating and declaring the principal, all accrued interest and any other amounts owing under the Loan

23

Documents due and payable, without presentment, demand, protest or further notice of any kind, and (iii) exercising any and all other rights and remedies under applicable law, the Financing Agreement or the other Loan Documents.

105.     Under the Pledge and Security Agreement, upon an Event of Default, MGG is entitled to all remedies provided for in the Pledge and Security Agreement, including but not limited to, (i) taking absolute control of the Collateral, (ii) requiring Defendants to assemble the Collateral and make it available to MGG at a location determined by MGG, and (iii) selling the Collateral at a public or private sale, for cash or on credit.

106.     Due to Zayat Stables' numerous breaches of the Loan Agreements and the resulting Events of Default, MGG has declared all amounts owing under the Loan Agreements, including but not limited to all outstanding principal and accrued and unpaid interest on the Loans, due and payable.

107.     As a direct and proximate result of Zayat Stables' breaches of the Loan Agreements, MGG has been damaged and is continuing to be damaged in an amount to be proven at trial, but not less than $23 million.

## COUNT II: Fraud
### (Against Zayat Stables and Ahmed Zayat)

108.     Plaintiff repeats the allegations contained in Paragraphs 1 through 107 as if fully set forth herein.

109.     By no later than December 2018, Zayat Stables and Ahmed Zayat engaged in a fraudulent scheme whereby they purported to sell off millions of dollars of Collateral pledged to secure the Loans, including Equine Collateral, without obtaining MGG's consent or otherwise notifying MGG as required by Loan Documents.

24

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000024 of 000030

110.     The improper purported sale of Collateral by Defendants in furtherance of their fraudulent scheme included some of Zayat Stables' most valuable assets, including the purported sale of nine breeding rights to 2015 Triple Crown winner AMEICAN PHAROAH for $3.3 million.

111.     At the time of their purported sales of Collateral, Defendants knew that the Collateral at issue was pledged to MGG to secure the Loans, and that the Loans were contingent upon the Collateral at issue – including specifically the AMERICAN PHAROAH breeding rights – being among Zayat Stables' assets.

112.     In furtherance of their fraudulent scheme, Defendants concealed their purported sales of Collateral, including Equine Collateral, from MGG so as to allow their fraudulent scheme to continue undetected.

113.     Under the Financing Agreement, Zayat Stables was required to provide MGG with certain periodic financial statements and other reports concerning its assets and operations.  Among other things, those reporting requirements obligated Zayat Stables to list the horses and other Equine Collateral owned by Defendants by type and value, and disclose any purported sales of such Equine Collateral by the Defendants.

114.     Since at least December 2018, the periodic reports Defendants provided to MGG omitted material information concerning the Equine Collateral owned by Defendants, including the Defendants' purported dispositions of the breeding rights to AMERICAN PHAROAH and other Equine Collateral pledged to MGG to secure the Loans.

115.     On or about December 12, 2019, in response to a Notice of Default sent by MGG, Defendants prepared and sent, or caused to be prepared and sent, to MGG a liquidation plan

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000025 of 000030

for Zayat Stables purporting to list the assets of Zayat Stables available to satisfy its payment obligations under the Loan Agreements.

116. Among other things, that liquidation plan listed equine assets purportedly belonging to Zayat Stables, including breeding rights to AMERICAN PHAROAH, that MGG later discovered were already purportedly sold by Defendants to third parties.

117. MGG reasonably relied on the fraudulent misrepresentations made in the liquidation plan, as well the numerous other fraudulent misrepresentations alleged herein that were made by Zayat Stables and Mr. Zayat over the course of their dealings with MGG.

118. On or about January 12, 2020, Mr. Zayat admitted to MGG that certain of Defendants' prior misstatements concerning Zayat Stables' assets were untrue, and in fact Defendants had purportedly sold the breeding rights to AMERICAN PHAROAH over the course of seven months between December 2018 and June 2019 for a total of $3.3 million.

119. On or about January 15, 2020, Mr. Zayat admitted to MGG that certain other of Defendants' prior misstatements concerning Zayat Stables' assets were untrue, and in fact Defendants had purportedly sold other Equine Collateral to third parties, including Equine Collateral relating to AMERICAN CLEOPATRA, GRAMMAJO, DANYELLI, LEXENDARY, OLD GLORY and LEMOONA.

120. On or about January 16, 2020, MGG discovered that additional of Defendants' prior misstatements concerning Zayat Stables' assets were untrue, and in fact Defendants had purportedly sold other Equine Collateral to third parties, including Equine Collateral relating to AMANDREA, ASH N' EM, MAJID, BODEMEISTER, ESKENDEREYA, EL KABEIR, ZENSATIONAL, JUSTIN PHILLIP, and PRAYER FOR RELIEF.

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000026 of 000030

26

121.    Notwithstanding their purported sales of Collateral, Defendants failed to make mandatory prepayments towards the principal of the loans from the proceeds of those transactions.  Instead, Defendants hid those transactions from MGG and, upon information and belief, improperly pocketed the sale proceeds for their own use.

122.    The foregoing statements and omissions by Defendants constitute material misstatements, which Defendants knew or should have known at the time were materially misleading and were relied upon by MGG as a material inducement to, among other things, make the Loans, and to refrain from asserting its rights to accelerate re-payment of the loans.

123.    As a direct and proximate result of Defendants' material misstatements, MGG has been damaged and is continuing to be damaged in an amount to be proven at trial, but not less than $23 million.

### COUNT III: Appointment of a Receiver

124.    Plaintiff repeats the allegations contained in Paragraphs 1 through 122 as if fully set forth herein.

125.    Upon information and belief, the Collateral may be inadequate to satisfy the debts and obligations Defendants owe MGG under the Loan Agreements.

126.    Upon information and belief, the financial condition of Defendants is in question because of their inability to make payments to MGG.

127.    Upon information and belief, Defendants have purported to sell portions of the Equine Collateral securing the Loans, yet still failed to make scheduled payments to MGG.

128.    In addition, at numerous points in the lending relationship, Defendants have provided inaccurate information to MGG and/or have failed to provide requested information.

129.    As demonstrated above, Plaintiff has valid claims against Zayat Stables for breaches of the Financing Agreement and Pledge and Security Agreement.

130.    Based on the foregoing, there is no adequate remedy at law to preserve MGG's security interest in the Collateral.

131.    Equity demands that a Receiver be appointed to protect MGG's security interest in the Collateral.

132.    MGG requests that a Receiver be appointed to manage the day-to-day operations of Zayat Stables, to conserve the assets of Zayat Stables, and to protect MGG's security interest in the Collateral.

### COUNT IV: Attorneys' Fees and Costs

133.    Plaintiff repeats the allegations contained in Paragraphs 1 through 131 as if fully set forth herein.

134.    Pursuant to Section 12.06 the Financing Agreement and the Pledge and Security Agreement, MGG is entitled to reasonable attorneys' fees and costs incurred, with interesting accruing thereon, due to the MGG's enforcement of the terms of the Financing Agreement and the Pledge and Security Agreement.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an Order in its favor against Defendants granting the following relief:

a.    On Count I, an award of damages against Zayat Stables in an amount to be proven at trial, but no less $23 million plus all other amounts that are owed, have accrued or that will continue to accrue under the Loan Agreements, together with attorneys'

28

fees and other costs of collection, as well as all other remedies provided for in the Financing Agreement and Loan and Security Agreements; and

b.    On Count II, an award of damages against Zayat Stables and Mr. Zayat in an amount to be proven at trial, but no less $23 million plus all other amounts that are owed, have accrued or that will continue to accrue under the Loan Agreements, together with attorneys' fees and other costs of collection, as well as all other remedies provided for in the Financing Agreement and Loan and Security Agreements; and

c.    On Count III, an Order that a Receiver be appointed to manage the day-to-day operations of Zayat Stables, to conserve the assets of Zayat Stables, and to protect MGG's security interest in the Collateral; and

d.    On Count IV, an award of costs and attorneys' fees, as expressly authorized by the Financing Agreement and the Pledge and Security Agreement; and

e.    On all Counts, an award of pre- and post- judgment interest at the default rate of interest specified in the Financing Agreement, the Pledge and Security Agreement and/or the other Loan Documents; and

f.    Such other relief as the Court may deem just and proper.

29

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000029 of 000030

Filed                    20-CI-00248   01/21/2020                    Vincent Riggs, Fayette Circuit Clerk

Dated: Lexington, Kentucky
       January 21, 2020

WYATT, TARRANT & COMBS, LLP

By: */s/ W. Craig Robertson, III*
    W. Craig Robertson III
    Daniel E. Hitchcock
    Thomas E. Travis
    250 West Main Street, Suite 1600
    Lexington, KY 40507-1746
    Phone: (859) 288-7667
    Email: wrobertson@wyattfirm.com

    *Attorneys for Plaintiff MGG*
    *Investment Group LLP*

Presiding Judge: HON. KIMBERLY BUNNELL (622203)

COM : 000030 of 000030